McGEE, Chief Judge.
 

 *447
 
 Derrick Aundra Huey ("Defendant") shot and killed James Love ("Love") on 13 October 2011, at approximately 11:00 p.m. According to Defendant's evidence, Defendant has an IQ of 61, and his mental faculties were additionally impaired as a result of an attempted suicide by automobile crash, resulting in head trauma. Defendant has reported hallucinations and has been treated with antipsychotic and antidepressant medications.
 

 Further, according to Defendant's evidence, on 13 October 2011, he was attempting to purchase drugs from an unidentified man when Love, with whom Defendant had had altercations in the past, approached and threatened Defendant and the unidentified man. Earlier that same evening, Love had also threatened Defendant in the apartment of Defendant's girlfriend. According to Defendant, Love hit Defendant in the head, and threatened Defendant with what Defendant believed was a knife. The unidentified man drew a handgun while Love continued to threaten Defendant. Defendant grabbed the weapon from the unidentified man and fired a warning shot. When the warning shot did not stop Love, Defendant fired another shot that struck Love, killing him. Love was known to carry a box cutter for protection, and a box cutter was found near Love's body.
 

 *305
 
 According to Defendant, the unidentified man took the gun and ran away. At trial, Defendant's psychological expert witness, Dr. George Patrick Corvin ("Dr. Corvin"), testified,
 
 inter alia,
 
 concerning Defendant's low I.Q. and brain trauma, and how these conditions affected Defendant's decision-making process.
 

 *448
 
 The State presented evidence that Defendant called 911 and reported the shooting, stating: "I shot a motherf* * * * *. I ... I hope I killed that son of a bitch[,]" but Defendant did not identify himself. A neighbor reported seeing Defendant drive away from the scene shortly after the shooting, but Defendant returned very shortly thereafter. When initially interviewed by the police, Defendant denied having shot Love, claiming that the unidentified man shot Love. Defendant gave multiple accounts of the events of that night. After Defendant listened to the 911 call, he admitted that he shot Love. At trial, the State argued that Defendant again changed his position before trial, and that Defendant intended to claim he did not shoot Love. According to the State, Defendant maintained this position until approximately four months before the trial. The State argued that only after Defendant sat down with his attorney and Dr. Corvin, did Defendant decide to again admit to shooting Love, and to argue that Love was shot in self-defense.
 

 Defendant's trial on first-degree murder commenced on 7 July 2014. The jury found Defendant guilty of voluntary manslaughter on 18 July 2014. Defendant was sentenced to seventy-three months' to ninety-seven months' imprisonment. Defendant appeals.
 

 I.
 

 In Defendant's first argument, he contends "the trial court erred by failing to intervene
 
 ex mero motu
 
 when the State made improper statements during closing arguments[.]" We agree.
 

 Our Supreme Court has recently reminded us that:
 

 During closing arguments, prosecutors are barred by statute from "becom[ing] abusive, inject[ing their] personal experiences, [and] express[ing their] personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant." N.C.G.S. § 15A-1230 (2014). Within those confines, however, we have long recognized that " 'generally, prosecutors are given wide latitude in the scope of their argument and may argue to the jury the law, the facts in evidence, and all reasonable inferences drawn therefrom.' " This latitude is reflected in our deferential standards of review. When opposing counsel objects during a closing argument, we review for abuse of discretion. When there is no objection, we review for gross impropriety. In all cases, we view the remarks "in context and in light of the overall factual circumstances to which they refer."
 

 *449
 
 Judicial deference, however, is not unlimited. In particular, "we have found grossly improper the practice of flatly calling a witness or opposing counsel a liar when there has been no evidence to support the allegation."
 
 [See]
 

 State v. Locklear,
 

 294 N.C. 210
 
 , 217,
 
 241 S.E.2d 65
 
 , 70 (1978) ("It is improper for a lawyer to assert his opinion that a witness is lying. He can argue to the jury that they should not believe a witness, but he should not call him a liar." (citations and internal quotation marks omitted)).
 

 State v. Hembree,
 

 368 N.C. 2
 
 , ----,
 
 770 S.E.2d 77
 
 , 88-89 (2015) (citations omitted).
 

 In
 
 Hembree,
 
 the State argued the following in its closing argument:
 

 He [defendant] has manipulated his attorneys. Don't let him manipulate you. Don't let him work the system again. .... [Y]ou heard video confessions of how he killed Heather Catterton and Randi Saldana. And then the defense started, they started putting up these smoke screens, started to try to confuse you.
 

 ....
 

 [A]t no point, no point in the last 18 months since this has been pending trial, has he ever recanted killing Heather or Randi. Never. Not until two years later when he could look at everything, when he can study the evidence, when he can get legal advi[c]e from his attorneys, does he come up with this elaborate tale as to what took place.
 

 *306
 
 ....
 

 Two years later, after he gives all these confessions to the police and says exactly how he killed Heather and Randi Saldana ... the defense starts. The defendant, along with his two attorneys, come together to try and create some sort of story.
 

 ....
 

 Think back to December 5th of 2009 when he knew nothing, when he had no legal advice; consistently, voluntarily told the police everything, and it was consistent with what the evidence showed.... For hours you watched this man confess to killing Heather and Randi Saldana, and now, after 18 months to two years, the defense begins and they
 
 *450
 
 put up smoke screens and they tried to confuse you? ... We've got two women dead, and he killed them.
 

 Id.
 

 at ----,
 
 770 S.E.2d at 89
 
 . Our Supreme Court then held:
 

 In context, the import of these arguments is clear: The State argued to the jury, not only that defendant had confessed truly and recanted falsely, but that he had lied on the stand in cooperation with defense counsel. Whether or not defendant committed perjury, there was no evidence showing that he had done so at the behest of his attorneys. Accordingly, we hold that the prosecutor's statements to this effect were grossly improper, and the trial court erred by failing to intervene
 
 ex mero motu.
 

 Id.
 

 In the case now before this Court, the State argued the following in closing:
 

 Innocent men don't lie. Innocent men don't lie because they don't have to. The truth is not something you practice. Telling the truth is not something you have to rehearse. The truth just is, and the truth in this case is James Love was shot because of an insult.
 

 ....
 

 [N]ow, up until about four months ago [D]efendant had planned to come in here and tell you all he didn't do it; he changed his mind, and he's now testified under oath that he is, in fact, the man who fatally shot James Love[.]
 

 ....
 

 I'm going to say this again, innocent men don't lie, they simply don't have to. The truth shall set you free unless, of course, you're on trial for a murder that you committed.
 

 ....
 

 When you look back at 2011 you'll be able to find the truth.
 

 You're not going to find it over there, not anymore. [D]efendant is not going to give you the truth. He's spent years planning to come in here to tell you he didn't do it, and then in the past four months he's come up with another story, and he's decided to go with that instead. But
 
 *451
 
 he's going to stick to that story,
 
 that story that he developed after he sat down with his attorney and his defense experts and decided on what he wanted to tell you. You're not going to find the truth there.
 

 But even when [D]efendant tries to hide the truth from you all, it slips out here and there. For example, it slips out when [D]efendant says things to his defense expert
 
 like my attorneys want me to go with self-defense at trial.
 

 ....
 

 Now, all of a sudden you heard Dr. Corvin.
 
 He sat down with [Defendant's attorney] and [D]efendant and made sure the defendant understood the law, understood what he was charged with, what the elements were, and understood the defenses and what they meant and the law about the defenses.
 
 As he sits there on the stand, as he sits there right now, it has been explained to [D]efendant you're supposed to consider the fierceness of the assault that he was victim to.
 
 So isn't it interesting that four months ago it went from a grab to it went [to] a punch, a slash, a hack, not just at me but at everybody.
 
 All of a sudden a grab went to a wild-armed (phonetic) handle.
 
 Now that the law has been explained to him, now that he's been talked out of claiming I didn't do it.
 

 ....
 

 *307
 
 [Defendant's attorney] tells you all we're trying to hide from this. All the evidence shows the box cutter was involved, the box cutter was involved, all the evidence. Do you know who's not a witness in this case? [Defendant's attorney]. He wasn't there.
 
 He's paid to defend [D]efendant.
 

 ....
 

 There's no real threat. There's no real threat except for the one
 
 that was created sometime four months ago to try and sell you on something.
 

 ....
 

 Now, I want to talk a little bit about Dr. Corvin, some of his opinions. But before we do that, we've got to make something clear. Make no mistake.
 
 Dr. Corvin has a client here. He works for [D]efendant. He is not an impartial
 

 *452
 

 mental-health expert.
 
 There are several who know [D]efendant: Drs. Fuller, Castro, Abramowitz. He didn't call any of those, he called Dr. Corvin.
 
 Dr. Corvin is part of the defense team, he has a specific purpose, and he's paid for it. You heard Dr. Corvin earns over $300,000 a year just working for criminal defendants. He is not impartial. In fact, I'd suggest to you he's just a $6,000 excuse man. That's what he is.
 

 ....
 

 So according to Dr. Corvin, [D]efendant [ ]formed the intent to kill himself, but for some reason that he never explained to you, he's taken the stand to say, well, he can certainly intend to kill himself, but in his opinion he can't intend to kill James Love.
 
 Does that make a lick of sense or does that just show you that Dr. Corvin came in here and did exactly what he was paid to do?
 
 And, again, what else might show you this?
 

 Again, many doctors have met [D]efendant. Many who were not hired to help him in the defense, you didn't hear from a single one.
 

 During cross-examination, the State questioned Dr. Corvin about his initial meeting with Defendant, which only included Defendant and Dr. Corvin, and from which Dr. Corvin produced notes. In that meeting, Defendant told Dr. Corvin he did not shoot Love, but that his attorney was trying to get him a plea deal, or to go to trial arguing self-defense. The State asked Dr. Corvin: "So, when you end your meeting in January, though, [D]efendant is dead set, I didn't do it, that's some drug dealer shot James, I had nothing to do with it, right?" Dr. Corvin responded that that was correct. The State then asked Dr. Corvin about a subsequent meeting with Defendant that Defendant's attorney also attended, and compared it with the first meeting:
 

 Q. And in that two hours [during the first meeting], safe to say you took about 11 pages of notes?
 

 A. That sounds about right. I can count them, but something like that.
 

 Q. Now, that was in January.
 

 A. Yes.
 

 *453
 
 Q. In March you went back to talk to [D]efendant, right?
 

 A. Yes.
 

 Q. The first meeting was in January. That was by yourself.
 

 A. Yes.
 

 Q. Second meeting in March, you go with [Defendant's attorney].
 

 A. Yes.
 

 Q. Anybody else go with you?
 

 A. I don't think so. No, not by my memory.
 

 Q. But you did meet [D]efendant in person.
 

 A. Yes. This was a contact visit, yes.
 

 Q. And you spent probably another two hours talking to him.
 

 A. A little south of that, but close, yes.
 

 Q. Now, when you went in January, you took 11 pages of notes in two hours.
 

 A. Yes.
 

 Q. How many pages of notes did you take the two hours you spent in March?
 

 A. None. Well, none, but I authored a report shortly thereafter, which is sometimes done for clinical reasons, yes.
 

 Q. Now, at the end of the March meeting [D]efendant had agreed to go with self-defense.
 

 *308
 
 A. Well, I don't know what he had agreed to. I don't discuss that strategy with him. What I can tell you is that he described a sequence of events that in my mind was self-defense.
 

 The State focused on the fact that, when Dr. Corvin met with Defendant alone the first time, Defendant maintained he did not shoot Love, and that Dr. Corvin had taken copious notes. The implication from the State was that, in the second meeting attended by Defendant's attorney, Dr. Corvin decided not to record what was discussed because the discussion was about coming up with an "excuse." The further implication
 
 *454
 
 was, as a result of that meeting, Defendant decided to change his story. This was also the State's argument in closing.
 

 As our Supreme Court stated in
 
 Hembree:
 
 "In context, the import of these arguments is clear[.]"
 
 Hembree,
 
 368 N.C. at ----,
 
 770 S.E.2d at 89
 
 . The State, in this case, argued to the jury not only that Defendant was a liar, "but that he had lied on the stand in cooperation with defense counsel" and Dr. Corvin.
 

 Id.
 

 "Whether or not [D]efendant committed perjury, there was no evidence showing that he had done so at the behest of his attorney" or Dr. Corvin.
 

 Id.
 

 In addition, taken in context, it is clear the State was arguing that Dr. Corvin would say whatever the defense wanted him to say, because he was being paid to do so.
 

 Further, the State implied that Dr. Corvin was committing perjury because "he [was] just a $6,000 excuse man[,]" and would do "exactly what he was paid to do." The State also indicated that the jury should not trust Defendant's counsel because he was "paid to defend the defendant." This was improper.
 
 State v. Rogers,
 

 355 N.C. 420
 
 , 460-63,
 
 562 S.E.2d 859
 
 , 883-86 (2002). "In light of the cumulative effect of the improprieties in the prosecutor's cross-examination of defendant's expert and the prosecutor's closing argument, we are unable to conclude that defendant was not unfairly prejudiced."
 
 Id.
 
 at 465,
 
 562 S.E.2d at 886
 
 (citation omitted). "Accordingly, we hold that the prosecutor's statements to this effect were grossly improper, and the trial court erred by failing to intervene
 
 ex mero motu.
 
 "
 
 Hembree,
 
 368 N.C. at ----,
 
 770 S.E.2d at 89
 
 . Because Defendant's entire defense was predicated on his credibility and the credibility of his witnesses, we cannot deem this error to have been harmless. We vacate Defendant's conviction and sentence and remand for a new trial.
 

 II.
 

 Because this issue will likely reoccur upon retrial, we address Defendant's second argument. In Defendant's second argument, he contends "the trial court erred by instructing the jury on flight when this instruction was not supported by the evidence." We disagree.
 

 Evidence introduced at trial tends to show that Defendant shot Love, then got into his vehicle, drove off for a short period of time, and returned. The firearm Defendant used to shoot Love was never recovered.
 

 "So long as there is some evidence in the record reasonably supporting the theory that defendant fled after commission of the crime charged, the instruction is properly given. The fact that there may be
 
 *455
 
 other reasonable explanations for defendant's conduct does not render the instruction improper."
 
 State v. Irick,
 

 291 N.C. 480
 
 , 494,
 
 231 S.E.2d 833
 
 , 842 (1977) (citation omitted). "Mere evidence that defendant left the scene of the crime is not enough to support an instruction on flight. There must also be some evidence that defendant took steps to avoid apprehension."
 
 State v. Thompson,
 

 328 N.C. 477
 
 , 490,
 
 402 S.E.2d 386
 
 , 392 (1991) (citation omitted). There is some evidence in the record supporting the theory that Defendant drove away briefly in order to dispose of the firearm he used to shoot Love. This argument is without merit.
 

 NEW TRIAL.
 

 Judges HUNTER, JR. and DAVIS concur.