IN THE SUPREME COURT OF NORTH CAROLINA

No. 355PA15

Filed 29 September 2017

STATE OF NORTH CAROLINA

v.

DERRICK AUNDRA HUEY

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 777 S.E.2d 303 (2015), finding prejudicial error after appeal from a judgment entered on 18 July 2014 by Judge Eric L. Levinson in Superior Court, Mecklenburg County, and ordering that defendant receive a new trial. Heard in the Supreme Court on 29 August 2017.

> *Joshua H. Stein, Attorney General, by Alvin W. Keller, Jr., Assistant Attorney General, and Derrick C. Mertz, Special Deputy Attorney General, for the State-appellant.*
>
> *Sarah Holladay for defendant-appellee.*

BEASLEY, Justice.

In this appeal we consider whether statements made by the prosecutor in his closing argument were improper and prejudicial, such that the trial court should have intervened *ex mero motu*. The Court of Appeals concluded that the prosecutor's insinuations that defendant was a liar and lied on the stand in cahoots with defense counsel and his expert witness were improper, and had the cumulative effect of resulting in unfair prejudice to defendant. The unanimous panel of the Court of

Appeals vacated the conviction and ordered a new trial. We hold that while the prosecutor's arguments were improper, the prosecutor's arguments did not amount to prejudicial error in light of the evidence against defendant. Accordingly, we reverse the decision of the Court of Appeals.

On 24 October 2011, defendant was indicted for first-degree murder. Defendant pleaded not guilty, and his trial commenced on 7 July 2014 before Judge Eric L. Levinson in Superior Court, Mecklenburg County. At trial the State's evidence tended to show that on 13 October 2011, at approximately 11:00 p.m., defendant Derrick Aundra Huey retrieved his gun from his truck, put the gun in his pocket, and told an unidentified person to ask James Love to come outside and talk about an earlier disagreement. Defendant then shot Love while they stood in the street. After the shooting defendant called 911 and, without identifying himself, stated, "I shot the motherfucker." A neighbor saw defendant's truck leave the scene after the shooting, but then returned shortly thereafter. Defendant initially denied shooting Love and told the police an unidentified man shot the victim. After listening to the 911 call, defendant admitted that he shot Love. Before trial defendant changed his account of the events in question numerous times. Then four months preceding trial, after communications with his attorney and expert witness, psychiatrist George Patrick Corvin, M.D., defendant changed his story once again and decided to admit to shooting Love, arguing that Love was shot in self-defense.

Defendant's evidence tended to show defendant and the victim had a history of prior altercations. Defendant testified that on the night in question, the victim threatened defendant. According to defendant, he was attempting to purchase drugs from an unidentified man when Love approached. Love hit defendant in the head and threatened him with what defendant believed to be a knife. While Love continued to threaten defendant, the unidentified man drew a handgun. Defendant grabbed the unidentified man's weapon and fired a warning shot. When Love did not stop his aggressive actions towards defendant, defendant fired another shot, which killed Love. The unidentified man then took the gun and ran away. The defendant's evidence also showed the victim was known to carry a box cutter, and a box cutter was found near the victim's body. Further, the defense presented evidence that defendant has an intelligence quotient (I.Q.) of 61 and suffers from head trauma caused by an attempted suicide by automobile crash. Defendant's expert witness testified that his I.Q. and head trauma affected defendant's decision-making processes. Defendant also suffers from hallucinations, which have been treated with antipsychotic and antidepressant medications.

During closing arguments, the assistant district attorney opened by saying, "Innocent men don't lie." Over the course of his argument, the prosecutor used some variation of the verb "to lie" at least thirteen times. Referring to defendant, the prosecutor said:

> The defendant is not going to give you the truth. He's spent

years planning to come in here to tell you he didn't do it, and then in the past four months he's come up with another story, and he's decided to go with that instead. But he's going to stick to that story, that story that he developed after he sat down with his attorney and his defense experts and decided on what he wanted to tell you. You're not going to find the truth there.

The prosecutor continued:

[Dr. Corvin] sat down with Mr. Smith and the defendant and made sure the defendant understood the law, understood what he was charged with, what the elements were, and understood the defenses and what they meant and the law about the defenses. As he sits there on the stand, as he sits there right now, it has been explained to the defendant you're supposed to consider the fierceness of the assault that he was victim to. So isn't it interesting that four months ago it went from a grab to it went to a punch, a slash, a hack, not just at me but at everybody. All of a sudden a grab went to a wild-armed (phonetic) handle. Now that the law has been explained to him, now that he's been talked out of claiming I didn't do it.

. . . But when the defendant was given a chance to just tell you the truth, he decided he's going to tell you whatever version he thought would get you to vote not guilty.

Referring to defense counsel, the prosecutor said:

Mr. Smith tells you all we're trying to hide from this. All the evidence shows the box cutter was involved, the box cutter was involved, all the evidence. Do you know who's not a witness in this case? Mr. Smith. He wasn't there. He's paid to defend the defendant.

Referring to the defense's expert witness, Dr. Corvin, the prosecutor stated:

Now, I want to talk a little bit about Dr. Corvin,

> some of his opinions. But before we do that, we've got to make something clear. Make no mistake. Dr. Corvin has a client here. He works for the defendant. He is not an impartial mental-health expert. . . . Dr. Corvin is a part of the defense team, he has a specific purpose, and he's paid for it. You heard Dr. Corvin makes over $300,000 a year just working for criminal defendants. He is not impartial. In fact, I'd suggest to you he's just a $6,000 excuse man. That's what he is. . . . Dr. Corvin came in here and did exactly what he was paid to do[.]

The prosecutor repeated the theme of "innocent men don't lie" once more in the opening of his rebuttal argument, stating: "I'm going to say this again, innocent men don't lie, they simply don't have to. The truth shall set you free unless, of course, you're on trial for a murder that you committed." Defense counsel did not object at any of these points during the prosecutor's closing arguments. The trial court did not intervene *ex meru moto* at any time during the prosecutor's closing arguments.

On 18 July 2014, the jury found defendant guilty of voluntary manslaughter. Defendant appealed the conviction to the Court of Appeals, arguing "the trial court erred by failing to intervene *ex mero motu* when the State made improper statements during closing arguments."[1] *State v. Huey,* ___ N.C. App. ___, ___, 777 S.E.2d 303, 305 (2015). The Court of Appeals agreed with defendant, relying heavily on *State v. Hembree*, in which this Court held the prosecutor's statements in closing argument

---

[1] On appeal, defendant also argued the trial court erred in instructing the jury on flight. The Court of Appeals rejected this argument, concluding "[t]here is some evidence in the record supporting the theory that Defendant drove away briefly in order to dispose of the firearm he used to shoot Love." *Huey*, ___ N.C. App. ___, 777 S.E.2d at 308 (2015). That decision is not on appeal to this Court.

were grossly improper and the trial court erred by failing to intervene *ex mero motu*, but did not address whether this error, which was one of three identified by the defendant, was prejudicial in isolation. 368 N.C. 2, 20, 770 S.E.2d 77, 89 (2015). In this case the Court of Appeals summarily determined that defendant's entire defense was predicated on his credibility and the credibility of his expert witness; therefore, the panel concluded that the trial court's error in failing to intervene *ex mero motu* in the prosecutor's improper closing argument could not be deemed harmless. *Huey*, ___ N.C. App. at ___, 777 S.E.2d at 308. The court vacated defendant's conviction and sentence and remanded the case for a new trial. *Id.* at ___, 777 S.E.2d at 308.

In an attempt to strike a balance between allowing attorneys appropriate latitude to argue heated cases and enforcing proper boundaries to maintain professionalism, this Court has considered prosecutors' closing arguments at length.

> The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene ex mero motu. In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord . . . .

*State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002) (citing *State v. Trull*, 349 N.C. 428, 451, 509 S.E.2d 178, 193 (1998), *cert. denied*, 528 U.S. 835, 145 L. Ed. 2d 80 (1999)). Thus, when defense counsel fails to object to the prosecutor's improper argument and the trial court fails to intervene, the standard of review requires a two-

step analytical inquiry: (1) whether the argument was improper; and, if so, (2) whether the argument was so grossly improper as to impede the defendant's right to a fair trial. *See Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157 (1986); *see also Jones,* 355 N.C. at 133-34, 558 S.E.2d at 107-08. Only when it finds both an improper argument and prejudice will this Court conclude that the error merits appropriate relief. *See Jones*, 355 N.C. at 134-35, 558 S.E.2d at 108-09 (ordering a new sentencing hearing because the prejudicial arguments were made during the sentencing phase of the defendant's capital trial).

First, although control of jury argument is left to the discretion of the trial judge, trial counsel must nevertheless conduct themselves within certain statutory parameters. *State v. Wiley*, 355 N.C. 592, 632, 565 S.E.2d 22, 50 (2002), *cert. denied* 537 U.S. 1117, 154 L. Ed. 2d 795 (2003). It is improper for lawyers in their closing arguments to "become abusive, inject [their] personal experiences, express [their] personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record." N.C.G.S. § 15A-1230(a)(2015). Within these statutory confines, we have long recognized that " 'prosecutors are given wide latitude in the scope of their argument' and may 'argue to the jury the law, the facts in evidence, and all reasonable inferences drawn therefrom.' " *State v. Phillips,* 365 N.C. 103, 135, 711 S.E.2d 122, 145 (2011) (quoting *State v. Goss,* 361 N.C. 610, 626, 651 S.E.2d 867, 877 (2007), *cert. denied,*

555 U.S. 835, 172 L. Ed. 2d 58 (2008)), *cert. denied,* 565 U.S. 1204, 182 L. Ed. 2d 176 (2012).

If an argument is improper, and opposing counsel fails to object to it, the second step of the analysis requires a showing that the argument is *so grossly* improper that a defendant's right to a fair trial was prejudiced by the trial court's failure to intervene. *Jones*, 355 N.C. at 133, 558 S.E.2d at 107. Our standard of review dictates that "[o]nly an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Anthony*, 354 N.C. 372, 427, 555 S.E.2d 557, 592 (2001) (quoting *State v. Richardson*, 342 N.C. 772, 786, 467 S.E.2d 685, 693, *cert. denied*, 519 U.S. 890, 136 L. Ed. 2d 160 (1996)). "[I]t 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.' " *Darden*, 477 U.S. at 181, 91 L. Ed. 2d at 157 (quoting *Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir. 1083)). For an appellate court to order a new trial, the "relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Id.* at 181, 91 L. Ed. 2d at 157 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *State v. Mann*, 355 N.C. 294, 307-08, 560 S.E.2d 776, 785 ("[T]o warrant a new trial, the prosecutor's remarks must have perverted or contaminated the trial such that they rendered the proceedings fundamentally unfair."), *cert. denied*, 537 U.S. 1005, 154 L. Ed. 2d 403

(2002). In determining whether a prosecutor's statements reached this level of gross impropriety, we consider the statements "in context and in light of the overall factual circumstances to which they refer." *State v. Alston,* 341 N.C. 198, 239, 461 S.E.2d 687, 709 (1995) (citing *State v. Pinch*, 306 N.C. 1, 24, 292 S.E.2d 203, 221, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *and overruled on other grounds by*, *inter alia*, *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988)). When this Court has found the existence of overwhelming evidence against a defendant, we have not found statements that are improper to amount to prejudice and reversible error. *State v. Sexton*, 336 N.C. 321, 363-64, 444 S.E.2d 879, 903 (concluding the trial court was not required to intervene *ex mero motu* when prosecutor directly called the defendant a liar), *cert. denied*, 513 U.S. 1006, 130 L. Ed. 2d 429 (1994), *grant of postconviction relief aff'd*, 352 N.C. 336, 532 S.E.2d 179 (2000).

Despite this deferential standard, this Court has held that improper arguments amount to prejudice when the circumstances required. In *Jones* this Court held that it was reversible error when the trial court failed to intervene in the closing argument of a sentencing hearing after the prosecutor's comment "You got this quitter, this loser, this worthless piece of—who's mean. . . . He's as mean as they come. He's lower than the dirt on a snake's belly." 355 N.C. at 133, 558 S.E.2d at 107. In the context of a sentencing proceeding in a capital case, which involves evidence specifically geared towards a defendant's character, past behavior, and personal qualities, "personal conclusions that. . . amount[ ] to little more than name-

calling" and "repeated degradations of the defendant" are "grossly improper and prejudicial." *Id*. at 134, 558 S.E.2d at 108. In *State v. Miller* this Court held the solicitor's remarks during closing arguments, especially those referencing the defendants as "habitual storebreakers," to be "grossly unfair" and "well calculated to mislead and prejudice the jury" because the defendants did not testify or offer their own character evidence, and the State did not present evidence to show the defendants were habitual storebreakers. 271 N.C. 646, 660, 157 S.E.2d 335, 346 (1967). "If verdicts cannot be carried without appealing to prejudice or resorting to unwanted denunciation, they ought not to be carried at all." *State v. Tucker*, 190 N.C. 708, 714, 130 S.E.2d 720, 723 (1925).

Turning to the prosecutor's closing argument in this case, we consider whether his statements were first, improper, and then, so grossly improper as to prejudice defendant's right to due process.

First, defendant argues the prosecutor's repeated statements insinuating that defendant lied were improper. Over the course of his argument, the prosecutor used some variation of "lie" at least thirteen times, though never directly calling defendant a liar. "Innocent men don't lie" appeared to be the State's theme: the prosecutor used it at the beginning of his closing argument and again when beginning his rebuttal. The prosecutor also referred to defendant's claim of self-defense as "just not a true statement." The prosecutor commented that the unidentified man involved in the shooting scenario was "imaginary" and "simply made up." The prosecutor also

asserted defendant engaged in "[t]he act of lying" and "trie[d] to hide the truth from you all." Relying on *Hembree*, defendant argues that even though the prosecutor did not directly call defendant a liar, the effect and intimations of his statements are also improper. 368 N.C. at 19-20, 770 S.E.2d at 89.

A prosecutor is not permitted to insult a defendant or assert the defendant is a liar. *See Jones*, 355 N.C. at 133-34, 558 S.E.2d at 107; *Miller*, 271 N.C. at 659, 157 S.E.2d at 345 ("[A prosecutor] can argue to the jury that they should not believe a witness, but he should not call him a liar."). A prosecutor is permitted to address a defendant's multiple accounts of the events at issue to suggest that the "defendant had not told the truth on several occasions and the jury could find from this that he had not told the truth at his trial." *State v. Bunning*, 338 N.C. 483, 489, 450 S.E.2d 462, 465 (1994). In this case there is no doubt the prosecutor's statements directed at defendant's credibility are improper. Statutorily, the prosecutor is not permitted to inject his opinion as to the truth or falsity of the evidence or comment on a defendant's guilt or innocence during his argument. N.C.G.S. § 15A-1230(a). Here the prosecutor injected his own opinion that defendant was lying, stopping just short of directly calling defendant a liar, and his theme, "innocent men don't lie," insinuated that because defendant lied, he must be guilty. The focus of the prosecutor's argument was not on presenting multiple conflicting accounts and allowing the jury to come to its own conclusion regarding defendant's credibility. Rather, the State's

argument appeared to overwhelmingly focus on attacking defendant's credibility through the prosecutor's personal opinion.

Nonetheless, even though the statements are improper, we do not find them to be so grossly improper that they amount to prejudice. Unlike the argument at issue in *Miller*, which this Court found prejudicial, the evidence in this case does support a permissible inference that defendant's testimony lacked credibility. Defendant gave six alternating versions of the shooting, five to police and one to the jury.[2] Accordingly, this was evidence from which the prosecutor could argue defendant had not told the truth on several occasions, from which, the jury could find that defendant had not told the truth at his trial. While we do not approve of the prosecutor's repetitive and dominant insinuations that defendant was a liar, we do believe sufficient evidence to supported the premise that defendant's contradictory statements were untruthful. Further, the evidence supporting defendant's voluntary manslaughter conviction is overwhelming, as discussed below.

Next, defendant argues that the prosecutor's assertion that defense expert witness Dr. Corvin was "just a $6,000 excuse man" was also improper. The statement

---

[2] Defendant told the 911 operator he shot the victim. He told Detective Crum he shot the victim, then told Detective Crum he meant to say an unknown male shot the victim. Defendant first told Detective Sterrett an unknown male shot the victim. Then he told Detective Sterrett he shot the victim after taking the gun from his truck and putting the gun in his pocket, and asking someone to get the victim to come outside. Then he told Detective Sterrett he shot the victim after approaching the victim with the gun exposed. At trial, defendant told the jury that while he was talking with a drug dealer, the victim approached and attacked him and the drug dealer, and defendant grabbed the drug dealer's gun and shot the victim.

implied Dr. Corvin was not trustworthy because he was paid by defendant for his testimony. Evidence in the record supports the assertion that Dr. Corvin received compensation. Dr. Corvin's practice received over $300,000 in 2012 for services to criminal defendants, and he testified he worked in excess of twenty hours on this case at the legislature-authorized rate of $320 per hour. This Court has held it is proper for an attorney to point out potential bias resulting from payment a witness received or would receive for his services, while it is improper to argue that an expert should not be believed because he would give untruthful or inaccurate testimony in exchange for pay. *State v. Rogers*, 355 N.C. 420, 462-64, 562 S.E.2d 859, 885-86 (2002). Here the prosecutor's statement goes beyond pointing out that Dr. Corvin was reimbursed for his opinion to argue that Dr. Corvin was paid to formulate an excuse for defendant. In *State v. Duke* this Court considered similar language when the prosecutor referred to the defendant's expert witness as the "$15,000 man" twice during closing arguments. 360 N.C. 110, 127-28, 623 S.E.2d 11, 23 (2005), *cert. denied*, 549 U.S. 855, 166 L. Ed. 2d 96 (2006). Though the statement in *Duke* was improper because it insinuated that the defendant's expert would say anything to get paid, we did not find this language "so overreaching as to shift the focus of the jury from its fact-finding function to relying on its own personal prejudices or passions." *Id*. at 130, 623 S.E.2d at 24. As is the case here, the prosecution's statement emphasized the expert witness's fee, and the jury may properly take that information into account when determining the credibility of the expert and the weight to place on his

testimony. *Id.* at 130, 623 S.E.2d at 24. In this case we do acknowledge the additional word "excuse" and believe this language amounts to name-calling, which is certainly improper.

Finally, defendant argues that the prosecutor improperly argued that defense counsel should not be believed because "[h]e's paid to defend the defendant." Defendant also argues the prosecutor improperly insinuated that the defense attorney and the defense expert conspired to assist defendant in committing perjury before the jury by stating: "[H]e's going to stick to that story, that story that he developed after he sat down with his attorney and his defense experts and decided on what he wanted to tell you. You're not going to find the truth there." We agree this language was improper. A prosecutor is not permitted to make "uncomplimentary" statements about defense counsel when "there is nothing in the record to justify it." *Miller*, 271 N.C. at 658, 157 S.E.2d at 345.

In *Hembree* this Court considered a similar statement by a prosecutor: "defendant, along with his two attorneys, come together to try and create some sort of story." 368 N.C. at 20, 770 S.E.2d at 89. In *Hembree,* as in the case *sub judice*, there was no evidence in the record to suggest either defendant committed perjury at the behest of his attorney. These arguments are improper because they not only allowed the prosecutor to inject his personal opinion about how defendant's trial strategy was formed, and thus insinuate the falsity of the testimony, but they also portray defense counsel in an "uncomplimentary" light by suggesting defense counsel

suborned perjury. In *Hembree* this Court did not consider whether the improper jury argument on its own amounted to prejudice. Instead, this Court held that the cumulative effect of the trial court's three errors (allowing excessive evidence of the defendant's prior conduct under Rule 404(b), allowing impermissible character evidence under Rule 404(a), and failing to intervene in improper jury argument) deprived the defendant of a fair trial without determining whether any single error was prejudicial in isolation. 368 N.C. at 9, 770 S.E.2d at 83. That kind of cumulative effect does not exist in this case. Here the improper jury argument was the single alleged error, occurring over the span of an eleven-day trial, that is before this Court on appeal. We turn now to the prejudice analysis.

Though "we have found grossly improper the practice of flatly calling a witness or opposing counsel a liar when there has been no evidence to support the allegation," *id.* at 19, 770 S.E.2d at 89 (quoting *Rogers,* 355 N.C. at 462, 562 S.E.2d at 885), the inquiry does not end there.[3] Despite our agreement with defendant that each of the prosecutor's contested statements are improper, the applicable standard of review requires us to consider whether these improper arguments deprived defendant of a

---

[3] *Rogers* cites to *Couch v. Private Diagnostic Clinic*, 133 N.C. App. 93, 100, 515 S.E.2d 30, 36 (1999), *aff'd per curiam*, 351 N.C. 92, 520 S.E.2d 785 (1999), in which this Court concluded that counsel "engaged in a grossly improper jury argument that included at least nineteen explicit characterizations of the defense witnesses and opposing counsel as liars," but this Court split over whether the trial court's failure to intervene *ex mero motu* was prejudicial to the defendant. Thus, the Court of Appeals holding that the improper argument was not of "such gross impropriety to entitle the defendants to a new trial," 133 N.C. App. at 100, 515 S.E.2d at 36, was left undisturbed and stands without precedential value.

fair trial. To demonstrate prejudice, defendant has the burden to show a "reasonable possibility that, had the error[s] in question not been committed, a different result would have been reached at the trial." N.C.G.S. § 15A-1443(a)(2015). The primary focus of our inquiry is not solely on the frequency of the improper arguments or the substance of such statements. While certainly taking such variables into consideration, a reviewing court must focus on the statements' likely effect on the jury's role as fact-finder, namely whether the jury relied on the evidence or on prejudice enflamed by the prosecutor's statements. *See Duke,* 360 N.C. at 130, 623 S.E.2d at 24. Though we cannot always be certain which aspects of evidence and argument the jury actually considered in coming to its decision, we must consider the arguments "in context and in light of the overall factual circumstances to which they refer." *Alston,* 341 N.C. at 239, 461 S.E.2d at 709 (citing *Pinch,* 306 N.C. at 24, 292 S.E.2d at 221). Thus, we look to the evidence presented at trial and compare it with what the jury actually found. Incongruity between the two can indicate prejudice in the conviction.

Here, despite defendant's five conflicting stories before trial, it was undisputed at trial that defendant shot the victim after having previously argued with him. Defendant admitted to being upset because the victim had "cussed him out" before the shooting. Immediately after the shooting, defendant admitted to the 911 operator that he shot the victim. According to defendant's own testimony, despite believing the victim may have had a knife or box cutter in one of his hands, he did not see a

weapon in the victim's hand before he shot him. Defendant explained that it was dark at the time, and although he never saw the box cutter, he "felt it." Defendant's injuries from the altercation consisted of a scratch on his collarbone area and a torn t-shirt, while the State presented evidence suggesting the additional "mark" on his head may have been in existence previously. According to defendant's own testimony, the unidentified bystander pulled out a gun to shoot the victim, and defendant grabbed the gun and shot the victim himself. It is undisputed that defendant fled the scene after the shooting. Defendant also testified he returned to the scene after fleeing. Defendant also admitted to drinking before and being high on heroin during the altercation. Finally, even without the prosecutor's statements addressing defendant's credibility, it was relatively clear from Detective Crum's, Detective Sterrett's, and defendant's own testimony that several, widely varying iterations of defendant's story existed prior to the version defendant presented to the jury at trial.

During its deliberations the jury asked to see a photo of the box cutter as it was found at the scene and the box cutter itself. The jury also asked to see the t-shirt defendant was wearing when he was arrested, which defendant testified had been torn during the altercation with the victim. Further, the jury asked to review the transcripts of the 911 call and Detective Sterrett's interrogation of defendant. Therefore, the jury considered the evidence during deliberations, rather than solely relying on the prosecutor's improper statements. Also, the jury's finding that defendant was guilty of voluntary manslaughter, rather than first-degree murder,

indicates the jury was persuaded by defendant's and his expert's testimony to some extent. If the prosecutor's statements had destroyed all credibility of the defense team, as defendant asserts, there would be no testimony to support a finding of voluntary manslaughter; however, the jury convicted defendant of voluntary manslaughter, indicating they found he acted in imperfect self-defense. A finding of self-defense, whether perfect or imperfect, requires the jury to find a defendant's testimony credible to some degree because the jury must find that the defendant possessed an honest and reasonable belief it was necessary to kill the victim in order to save himself from death or great bodily harm. *See State v. Norris*, 303 N.C. 526, 530, 279 S.E.2d 570, 572-73 (1981). Here the jury was properly instructed on self-defense and imperfect self-defense. From the evidence against defendant in this case, it is reasonable that a jury could find defendant used excessive force as there is no evidence he actually saw a weapon in the victim's hand. Defendant has not overcome the evidence against him and thus has failed to show prejudice. Therefore, it was error for the Court of Appeals to assume prejudice without considering the evidence against defendant and the jury's finding of voluntary manslaughter rather than first-degree murder.

For the foregoing reasons, we hold it was not reversible error when the trial court failed to intervene *ex mero motu* in the prosecutor's closing arguments. Nonetheless, we are disturbed that some counsel may be purposefully crafting improper arguments, attempting to get away with as much as opposing counsel and

the trial court will allow, rather than adhering to statutory requirements and general standards of professionalism. Our concern stems from the fact that the same closing argument language continues to reappear before this Court despite our repeated warnings that such arguments are improper. *See Jones*, 355 N.C. at 134-35, 558 S.E.2d at 108-09; *see also Rogers*, 355 N.C. at 464-65, 562 S.E.2d at 886.

"The power and effectiveness of a closing argument is a vital part of the adversarial process that forms the basis of our justice system. A well-reasoned, well-articulated closing argument can be a critical part of winning a case." *Jones*, 355 N.C. at 135, 558 S.E.2d at 108. Yet, arguments, no matter how effective, must avoid base tactics such as: (1) comments dominated by counsel's personal opinion; (2) insinuations of conspiracy to suborn perjury when there has been no evidence of such action; (3) name-calling; and (4) arguing a witness is lying solely on the basis that he will be compensated. Our holding here, and other similar holdings finding no prejudice in various closing arguments, must not be taken as an invitation to try similar arguments again. We, once again, instruct trial judges to be prepared to intervene *ex mero motu* when improper arguments are made.

Therefore, for the reasons stated above, we reverse the decision of the Court of Appeals as to the issue before us on appeal and instruct that court to reinstate the trial court's judgment.

REVERSED.