IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-863

Filed 6 August 2025

Columbus County, Nos. 20CRS051239-230, 23CRS000375-230

STATE OF NORTH CAROLINA

       v.

ANTHONY EDWARD WRIGHT, JR.

Appeal by Defendant from judgments entered 15 December 2023 by Judge Richard Kent Harrell in Columbus County Superior Court. Heard in the Court of Appeals 21 May 2025.

*Attorney General Jeff Jackson, by Assistant Attorney General Alexander H. Ward, for the State-Appellee.*

*William D. Spence for Defendant-Appellant.*

COLLINS, Judge.

Defendant Anthony Edward Wright, Jr., appeals from jury verdicts finding him guilty of voluntary manslaughter and possession of a firearm by a felon. Defendant argues on appeal that the trial court (1) "prejudicially erred by failing to charge the jury on justification as an affirmative defense to the charge of possession of a firearm by a felon" and (2) "erred in allowing the [State] to characterize Defendant as a liar and perjurer in [its] closing argument." We find no prejudicial error.

## I.    Background

Defendant was indicted for first-degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, and possession of a firearm by a felon, all stemming from events that took place on 8 June 2020.  Defendant's case came on for jury trial on 11 December 2023.  The evidence presented at trial tended to show the following:

### A.  Jonathan Peppers' Testimony

On 8 June 2020, Defendant was working with Jonathan Peppers, a family friend, helping to remodel a Time Saver service station ("store") in Brunswick, North Carolina.  Peppers' uncle had raised Defendant and, while he and Defendant were not actually family, they had "somewhat of a family relationship[.]"  That afternoon, after Defendant walked out of the store, Defendant and Brandon Baldwin engaged in a verbal argument in front of the store.  The two men were "having words back and forth," and Baldwin told Defendant, "I just want my ones.  I just want my ones.  I came here to fight.  I want my ones."

Peppers asked the two men "not to . . . get into it up there" because this was Peppers' first remodeling job.  Baldwin pulled up his shirt and said, "I ain't got no gun. I just want my ones." This meant that "[Baldwin] just wanted to fight."  Peppers helped de-escalate the situation, and the two men walked away from each other at the same time.

Baldwin walked away, got into his car, and started to drive off while Defendant

walked back towards the store. Baldwin then drove by the front of the store, stopped, and got out of his car while repeating that he "ain't got no gun" and that he wanted "his ones." Defendant went to his van, opened the door, and grabbed a pistol from inside. Peppers "looked up . . . and saw [Defendant] come around [Baldwin's] car, and [Defendant] was shooting at [Baldwin]."

Defendant aimed at and shot Baldwin from behind multiple times. Baldwin fell to the ground, got up, and ran around the outside of the store; Defendant chased Baldwin while still holding the pistol. Peppers followed the two men and saw them "tussling back and forth." Defendant choked Baldwin and stabbed him with a large knife.

Peppers turned around and told the store owner to call the police. Peppers went back to where the two men were fighting and saw Defendant "standing behind [Baldwin], and it was bloody. There was blood everywhere. . . . [Defendant] had a knife in his hand, and that's when he got up. He started walking, like, towards going to leave. And I turned around and left." Peppers never saw Baldwin with a gun or knife, but he did see Defendant holding a "large knife" as he "went to his van" and "drove off."

## B. Officers' Testimony

Officers with the Columbus County Sheriff's Office received a "shots fired call" and arrived at the store to find Baldwin "totally engulfed in blood." Baldwin's "injuries were so intense that it was just impossible to do anything for him." Baldwin

was alive when officers arrived on scene, but he was "just sitting there gasping for -- for air. He wasn't able to say anything. He tried to open his mouth once and speak, and saliva and blood mixture came out of his mouth." Officers saw Baldwin's "red frothy blood" and "brain matter on the cement" before witnessing Baldwin "t[a]k[e] his last breath" outside the store. The officers never saw Baldwin with a gun or knife or did not find any weapons at the scene.

### C. Dr. Michelle Aurelius' Testimony

Dr. Michelle Aurelius, the North Carolina Chief Medical Examiner, performed an autopsy on Baldwin's body and testified at trial as an expert in forensic, anatomic, and clinical pathology. Baldwin's injuries included "multiple gunshot wounds, multiple sharp force injuries and multiple blunt force injuries." Baldwin suffered three gunshot wounds: one to the back of his right lower leg, which shattered his tibia and fibula; one to the back of his right thigh; and one to his right upper back. Baldwin suffered multiple "sharp force injuries, including stab wounds," to his face, forehead, hands, upper extremities, and trunk, including a stab wound to his neck that went 3.5 inches deep and sliced his left carotid artery "caus[ing] a significant amount of blood loss" that "alone in and of itself can cause death." Baldwin also suffered blunt force trauma to his head and abrasions to his hands and upper and lower extremities. Baldwin died from blood loss caused by "multiple sharp, blunt and gunshot injuries."

### D. Defendant's Testimony

Defendant testified in his own defense. Defendant drove his van to the store

on the morning of 8 June 2020 and did not encounter Baldwin until sometime after lunch. Baldwin purportedly told him, "I'm gonna f[*]ck you up today" and threatened to kill Defendant and his family. Defendant watched Baldwin pull up his shirt and saw "the handle" of a weapon on Baldwin's hip. Defendant "kind of snapped" and "went into a rage" when Baldwin threatened him and his family, but Defendant "felt like [he] was just defending [him]self" because he knew "what type of person [Baldwin] was from the streets" and that Baldwin "had a reputation for violence." Baldwin "had his blade in his hand" and "[i]t was upside down on his -- up -- laying up against his arm." Defendant saw the "handle" of the weapon "on [Baldwin's] side or whatever" so he "reacted to it" and "fire[d] a shot at him." Baldwin then cut Defendant with the knife, so Defendant fought back while he "was in a murderous rage."

Defendant left the scene before the police arrived and took the knife and pistol with him. He left because he was afraid, and he "went straight to the police station" where he informed Columbus County law enforcement officers of "the event that took place," but they "told [him] they didn't have nothing" and told him that he "could leave." He returned to the police station later that night when he "received the report that they had a warrant for [his] arrest." He sought medical attention for his injuries while he was in custody, and law enforcement officers transported him to the hospital. He suffered from "[s]tab wounds to [his] hand, cuts to [his] shoulder, elbow, and forearm."

Defendant admitted that his medical records showed that he had "[a]brasions on the left shoulder and the right hand" and did not show that he suffered any stab wounds or lacerations to his shoulders, hands, or arms; the records did indicate that Defendant had a "face laceration measuring about three centimeters[.]" Defendant admitted multiple times to possessing the pistol and admitted to shooting Baldwin.

**E. Jury's Verdict**

The trial court dismissed the charge of assault with a deadly weapon with intent to kill inflicting serious injury. The jury found Defendant guilty of voluntary manslaughter, a lesser-included offense of first-degree murder, and possession of a firearm by a felon. The trial court sentenced Defendant to 84-113 months in prison for the voluntary manslaughter conviction and a consecutive sentence of 17-30 months in prison for the possession of a firearm by a felon conviction. Defendant gave proper notice of appeal.

## II. Discussion

Defendant argues that the trial court: (1) "prejudicially erred by failing to charge the jury on justification as an affirmative defense to the charge of possession of a firearm by a felon" and (2) "erred in allowing the [State] to characterize Defendant as a liar and perjurer in [its] closing argument."

**A. Jury Instruction**

Defendant first argues that the trial court either erred or plainly erred by failing to charge the jury on justification as an affirmative defense to the charge of

possession of a firearm by a felon. The parties address in various ways whether the issue was properly preserved for our review and the applicable standard of review. Our review of the record and transcripts shows that: Defendant filed a "Notice of Defense: Justification" prior to trial; Defendant requested the instruction on defense of justification during the charge conference; the trial court refused to give the requested instruction because it determined that the evidence was insufficient to charge the jury on justification; Defendant renewed the request prior to closing arguments and the trial court noted the renewed request; and Defendant, at the close of the trial court's jury instructions and after being asked by the trial court whether he had "any additions, corrections, or modifications to the instructions," again renewed "the motions previously made as part of the record." This issue was properly preserved for this Court's review.

This Court reviews properly preserved challenges to jury instructions de novo. *See State v. Mash*, 323 N.C. 339, 348 (1988). In order to determine "whether a defendant is entitled to a requested instruction, we review de novo whether each element of the defense is supported by the evidence, when taken in the light most favorable to defendant." *State v. Swindell*, 382 N.C. 602, 606 (2022) (quotation marks and citations omitted). The trial court must give the requested jury instruction only if it "is correct in itself *and supported by evidence . . . .*" *Id.* (quotation marks and citations omitted).

It is unlawful for "any person who has been convicted of a felony to . . . possess,

or have in his custody, care, or control any firearm . . . ." N.C. Gen. Stat. § 14-415.1(a) (2023). "The offense of possession of a firearm by a convicted felon has two essential elements: (1) the defendant has been convicted of a felony, and (2) the defendant subsequently possessed a firearm." *State v. Floyd*, 369 N.C. 329, 333 (2016) (citation omitted). Here, Defendant stipulated that he was a convicted felon for the purposes of N.C. Gen. Stat. § 14-415.1(a) and admitted multiple times while testifying to possessing a firearm. Defendant does not challenge the sufficiency of the evidence of this charge; rather, he argues that he was entitled to a jury instruction on justification as an affirmative defense to this charge.

Our Supreme Court has held that, "in narrow and extraordinary circumstances," the affirmative defense of justification may be available as a defense to a charge of possession of a firearm by a convicted felon. *State v. Mercer*, 373 N.C. 459, 463 (2020). The affirmative defense of justification "does not negate any element" of the offense charged, and "serves only as a legal excuse for the criminal act and is based on additional facts and circumstances that are distinct from the conduct constituting the underlying offense." *Id.* (quotation marks and citations omitted). "Thus, like other affirmative defenses, a defendant has the burden to prove his or her justification defense to the satisfaction of the jury." *Id.* (citations omitted). The Court in *Mercer* set forth four elements that a defendant must show to establish justification as a defense to a charge under N.C. Gen. Stat. § 14-415.1:

> (1) that the defendant was under unlawful and present,

imminent, and impending threat of death or serious bodily injury; (2) that the defendant did not negligently or recklessly place himself in a situation where he would be forced to engage in criminal conduct; (3) that the defendant had no reasonable legal alternative to violating the law; and (4) that there was a direct causal relationship between the criminal action and the avoidance of the threatened harm.

*Id.* at 464 (quotation marks and citation omitted).  A defendant is thus entitled to a justification instruction only when "each . . . factor is supported by evidence taken in the light most favorable to defendant" based on "the specific facts of the case at hand." *Id.* (citation omitted).

The critical inquiry under the first element in *Mercer* is whether a defendant was under "imminent and impending threat of death or serious bodily injury at the time he took possession of the firearm" and not at the time that he used the firearm. *State v. Monroe*, 233 N.C. App. 563, 570 (2014) (cleaned up).  Evidence showing that a convicted felon possessed a firearm prior to an altercation precludes an instruction on the defense of justification.  *See State v. Boston*, 165 N.C. App. 214, 222 (2004) (no error in failing to charge the jury on justification where the defendant was seen carrying a pistol the same day that he got into a fight with and shot the victim); *State v. Napier*, 149 N.C. App. 462, 465 (2002) (evidence did not support a conclusion that defendant was under an imminent threat of death or injury where it showed that defendant possessed a gun "for several hours" before a fight ensued).  Moreover, a convicted felon loses entitlement to the defense of justification where the evidence

shows that he continued to possess a firearm after the threat had passed. *See State v. Craig*, 167 N.C. App. 793, 796-97 (2005) (the defendant was not entitled to the defense of justification where the evidence showed that he "kept the gun and took it with him" after a fight because he was "not under any imminent threat of harm" or impending threat of death or bodily injury).

Here, the evidence tends to show that Defendant possessed the pistol hours before the fight with Baldwin and continued to possess the pistol after the altercation had concluded. Defendant testified that he drove his van to the store, arriving at approximately 8:00 a.m. on 8 June 2020, and worked there the entire morning until he took "a small break" for lunch at the store. After his break, he resumed his work and remained at the store until Baldwin arrived sometime in the afternoon. Shortly after Baldwin's arrival, Peppers watched Defendant "go to his van, and come out with a pistol and shoot" Baldwin. When asked if he saw Defendant reach into his van to get the pistol, Peppers testified, "Yes." As in *Boston* and *Napier*, this evidence supports that Defendant possessed the firearm prior to his encounter with Baldwin.

Additionally, Defendant testified that he took the pistol with him after the altercation with Baldwin. After the fight was over, he closed the trunk to his van, got into the driver's seat, drove away from the scene, and "took the gun" with him. When asked if he got rid of the gun, Defendant replied, "I wouldn't say, no, I got rid of [it]. I really didn't know what to do with [it]. . . . I just put [it] away." As in *Craig*, this evidence tends to show that Defendant continued to possess the firearm after the

altercation with Baldwin had ended and he was "not under any imminent threat of harm" or impending threat of death or bodily injury. 167 N.C. App. at 796-97. The uncontroverted evidence here supports that Defendant possessed the firearm both before and after his encounter with Baldwin, and Defendant cannot satisfy the first element of *Mercer*. *See Monroe*, 233 N.C. App. at 570.

Because Defendant "bears the burden to establish each element of the justification defense, and because we conclude that [D]efendant failed to meet his burden as to the [first] element, we need not analyze the [remaining] element[s]." *Swindell*, 382 N.C. at 607. "Thus, the evidence at trial, taken in the light most favorable to [D]efendant, fail[s] to support each element of the requested jury instruction on justification as a defense to the charge of possession of a firearm by a felon[,]" *id.*, and the trial court did not err in denying Defendant's requested instruction.

## B. Closing Argument

Defendant next argues that the trial court erred by failing to intervene ex mero motu during the State's closing argument when it "characterize[d] Defendant as a liar and perjurer."

This Court's standard of review for assessing alleged improper closing arguments that failed to provoke timely objection from opposing counsel is

> whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*. In other words, the reviewing

> court must determine whether the argument in question
> strayed far enough from the parameters of propriety that
> the trial court, in order to protect the rights of the parties
> and the sanctity of the proceedings, should have intervened
> on its own accord . . . .

*State v. Jones*, 355 N.C. 117, 133 (2002) (citation omitted).  Thus, "the standard of review requires a two-step analytical inquiry: (1) whether the argument was improper; and, if so, (2) whether the argument was so grossly improper as to impede the defendant's right to a fair trial."  *State v. Huey*, 370 N.C. 174, 179 (2017) (citations omitted).  Only when we find "both an improper argument and prejudice" will we "conclude that the error merits appropriate relief."  *Id.* (citation omitted).

"A prosecutor must be allowed wide latitude in the argument of hotly contested cases and may argue all the facts in evidence and any reasonable inferences that can be drawn therefrom."  *State v. Alford*, 339 N.C. 562, 571 (1995) (citation omitted).  However, a prosecutor may not express his "personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant . . . ."  *Huey*, 370 N.C. at 180 (citation omitted).  "The prosecutor may not determine matters of credibility and announce the result in open court – that is the jury's prerogative."  *State v. Locklear*, 294 N.C. 210, 218 (1978).  Additionally, a prosecutor may "address a defendant's multiple accounts of the events at issue to suggest that the defendant had not told the truth[,]" but he may not "insinuate[] that defendant lied" or "directly call[] defendant a liar."  *Huey*, 370 N.C. at 182 (cleaned up); *see State v. Miller*, 271 N.C. 646, 659 (1967) ("[A prosecutor] can argue to the jury that they should not believe a

witness, but he should not call him a liar.").

In determining whether the remarks were grossly improper, we consider "the context in which the remarks were made, as well as their brevity relative to the closing argument as a whole[.]" *State v. Taylor*, 362 N.C. 514, 536 (2008) (cleaned up). "[T]he impropriety of the argument must be gross indeed" in order for this Court to hold that the trial court "abused [its] discretion in not recognizing and correcting [e]x mero motu an argument which defense counsel apparently did not believe was prejudicial when he heard it." *State v. Johnson*, 298 N.C. 355, 369 (1979) (citation omitted). "When this Court has found the existence of overwhelming evidence against a defendant, we have not found statements that are improper to amount to prejudice and reversible error." *Huey*, 370 N.C. at 181 (citations omitted).

Defendant objects to two portions of the State's closing argument. Defendant first objects to the State's remark asserting that "[Defendant] elected to testify and tell you this story that it took him three years to come up with . . . ." He next objects to the bolded portions of the State's remark that:

> **[Defendant] comes up with this story** that he went and turned himself in and that law enforcement said, "Don't worry about it," and then comes back hours later. **Defense would have you believe that the first thing he did, the very first thing he did was go turn himself in. Not true.** That's not his testimony. The very first thing he did was get rid of those weapons, the gun and the knife. . . .

We agree that the challenged remarks are improper, as the State

impermissibly "insinuated" that Defendant was a liar and "inject[ed] [its] opinion as to the truth or falsity of" Defendant's testimony. *Huey*, 370 N.C. at 182. Here, the State did not "allow[] the jury to come to its own conclusion regarding [D]efendant's credibility," but instead "attack[ed] [D]efendant's credibility through the prosecutor's personal opinion," which it could not do. *Id.* We admonish counsel and the State to avoid such comments at risk of a mistrial or new trial. *Id.*

Despite the remarks being improper, they were not so grossly improper that they prejudiced Defendant by depriving him of his right to a fair trial. First, we consider the "brevity [of the remarks] relative to the closing argument as a whole," *Taylor*, 362 N.C. at 536, and note that they comprise only a few lines of the State's thirteen-page transcribed closing argument and that the rest of the closing argument was not challenged. Additionally, "the evidence supporting [D]efendant's voluntary manslaughter conviction is overwhelming[.]" *Huey*, 370 N.C. at 183.

Although Defendant was charged with first-degree murder, he was convicted of voluntary manslaughter. "Voluntary manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation." *State v. Norris*, 303 N.C. 526, 529 (1981) (citation omitted). Voluntary manslaughter requires the State to prove two elements: "(1) Defendant killed [the victim] by an intentional and unlawful act[,] and (2) Defendant's act was the proximate cause of [the victim's] death." *State v. English*, 241 N.C. App. 98, 105 (2015) (quotation marks omitted); *see also* N.C.P.I.–Crim. 206.13 (2018).

Here, Defendant testified that he shot Baldwin. Peppers testified that he witnessed Defendant shoot and stab Baldwin. Dr. Aurelius testified that Baldwin died from blood loss resulting from the gunshot wounds and stab wounds. The uncontroverted evidence tends to show that Defendant intentionally shot and stabbed Baldwin to death—the only elements necessary to prove voluntary manslaughter. Given this evidence, there is "no reasonable possibility that, had the errors in question not been committed, a different result would have been reached at the trial." *Huey*, 370 N.C. at 185 (brackets and citation omitted). We thus determine that the State's remarks were not so grossly improper as to deprive Defendant of his right to a fair trial, and the trial court did not abuse its discretion by failing to intervene ex mero motu during the State's closing argument. *Id.* at 186.

## III. Conclusion

Because the evidence at trial, taken in the light most favorable to Defendant, "fail[s] to support each element of the requested jury instruction on justification as a defense to the charge of possession of a firearm by felon[,]" the trial court did not err by refusing to instruct the jury on the defense of justification. *See Swindell*, 382 N.C. at 607.

And, while the challenged remarks made during the State's closing argument were improper and admonished, they were not so grossly improper as to deprive Defendant of his right to a fair trial; the trial court thus did not abuse its discretion by failing to intervene ex mero motu during the State's closing argument. *See Huey*,

370 N.C. at 186.

NO PREJUDICIAL ERROR.

Judge TYSON concurs.

Judge GRIFFIN concurs in the result only.