BERGER, Judge.
Eric Thomas Schricker ("Defendant") was convicted of second degree rape and second degree sexual offense on April 21, 2017. Defendant timely appeals, and argues that the trial court erred when it (1) did not intervene ex mero motu to strike statements made by the prosecutor during closing arguments; and (2) when it ordered Defendant to pay $2,090.00 in restitution, where this amount was not supported by the evidence. We address each argument in turn.
Factual and Procedural Background
Melinda Williams[1] ("Ms. Williams") and two friends went to the Hibernian Pub ("Hibernian") for drinks around 5:30 p.m. on April 11, 2014. At the Hibernian, Ms. Williams first made contact with Defendant while she and her friends had a few alcoholic drinks at the bar. She and a friend decided to leave the bar around 9:00 p.m., and on their way to the friend's home bought pizza and beer. At her friend's home, Ms. Williams had a couple sips of beer, a couple sips of a cocktail, and a "puff" of marijuana. Around 11:00 p.m., her friend's boyfriend dropped Ms. Williams and her friend off at the Pickled Onion, a nearby bar.
At the Pickled Onion, they ordered drinks and Ms. Williams' friend went to talk to someone her friend had met earlier that night. Ms. Williams began conversing with a man who was sitting at the bar, when Defendant "ended up coming over and sitting down at the table that [Ms. Williams] was at" and he tried "to get really close" and "put his arm around" her. Defendant eventually got up and left, and so Ms. Williams resumed her previous conversation. The man then suggested that they go someplace quieter, so they went outside and continued their conversation in his car, which was parked in front of the bar. During the conversation, the man drove his car to the far end of the parking lot. Once there, they began to kiss, and the man requested oral sex. Ms. Williams declined, and so he drove her back to the bar, she got out, and he left.
Ms. Williams then re-entered the Pickled Onion and returned to the same table at which she had been sitting earlier. Defendant re-approached Ms. Williams, and they eventually went outside to the front of the bar and began kissing. Then they decided to go back to Defendant's home. Ms. Williams testified that she had agreed to go to Defendant's home because she had thought that her friend would also end up at Defendant's home. They started walking toward Strickland Road, and then turned onto a wooded path that Ms. Williams thought was a shortcut to Defendant's home. Ms. Williams testified that she was not nervous, until they reached a fence in the woods, at which point she realized that they were not taking a shortcut.
Ms. Williams then stopped, grabbed onto a tree, and said "I'm not going any further." Defendant approached her and started to kiss her. Defendant began to get very aggressive, which caused Ms. Williams to fall and drop her belongings. Defendant straddled her and tried to kiss Ms. Williams again, but she resisted and attempted to push Defendant off. She also started yelling "[l]eave me alone." This caused Defendant to become even more aggressive, which caused Ms. Williams to give up and curl into a ball. After claiming he loved her, Defendant removed her pants and underwear, and urinated on her face. Ms. Williams testified that she then felt pain and pressure in her vagina and anus from Defendant "forcing himself on [her]." When Defendant had finished, he said, "Oh, my God. What did I just do?" "We got to get you cleaned up."
Ms. Williams was able to get in contact with her friend and tell her where she was so that she could be picked up. Defendant walked with Ms. Williams out of the woods, and Ms. Williams got into her friend's waiting car. Ms. Williams immediately told her friend that "[Defendant] just raped me." That same night, Ms. Williams also told her mother and another friend that she had been raped. After conversing with her mother, Ms. Williams decided to report the incident.
A warrant was issued for Defendant's arrest for second-degree rape and second-degree sexual offense on April 30, 2014, and Defendant was also indicted on these same offenses. On April 21, 2017, Defendant was found guilty of second degree rape and second degree sexual offense, and not guilty of sexual battery. He was sentenced to a term of 65 to 138 months in prison, and ordered to pay $2,090.00 in restitution. Additionally, Defendant was ordered to register as a sex offender and participate in satellite-based monitoring. Defendant filed timely notice of appeal.
Analysis
I. Closing Arguments
Defendant first argues that the trial court should have intervened ex mero motu to strike statements made by the prosecutor during closing arguments. We disagree.
The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene ex mero motu . In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made.
State v. Jones , 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002) (citation omitted).
[W]hen defense counsel fails to object to the prosecutor's improper argument and the trial court fails to intervene, the standard of review requires a two-step analytical inquiry: (1) whether the argument was improper; and, if so, (2) whether the argument was so grossly improper as to impede the defendant's right to a fair trial.
State v. Huey , 370 N.C. 174, 179, 804 S.E.2d 464, 469 (2017). Only where this Court "finds both an improper argument and prejudice will this Court conclude that the error merits appropriate relief." Id. (emphasis added).
In closing arguments,
an attorney may not become abusive, inject his personal experiences, express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record except for matters concerning which the court may take judicial notice. An attorney may, however, on the basis of his analysis of the evidence, argue any position or conclusion with respect to a matter in issue.
N.C. Gen. Stat. § 15A-1230(a) (2017) (emphasis added).
A well-reasoned, well-articulated closing argument can be a critical part of winning a case. However, such argument, no matter how effective, must: (1) be devoid of counsel's personal opinion; (2) avoid name-calling and/or references to matters beyond the record; (3) be premised on logical deductions, not on appeals to passion or prejudice; and (4) be constructed from fair inferences drawn only from evidence properly admitted at trial.
State v. Matthews , 358 N.C. 102, 112, 591 S.E.2d 535, 542 (2004) (citation omitted). Moreover, while an attorney should "not knowingly misinterpret ... the language or argument of opposite counsel," "a lapsus linguae that was neither calculated to mislead nor prejudicial in effect" will generally not rise to the level of gross impropriety necessitating the trial court's intervention ex mero motu . State v. Phillips , 365 N.C. 103, 136-37, 711 S.E.2d 122, 146 (2011) (citation and quotation marks omitted).
When this Court is asked to determine the impropriety of a prosecutor's argument, such that it may violate defendant's right to a fair trial, "[f]air consideration must be given to the context in which the remarks were made and to the overall factual circumstances to which they referred." State v. Moseley , 338 N.C. 1, 50, 449 S.E.2d 412, 442 (1994) (citation and quotation marks omitted). In addition, a perceived "attack upon the credibility of the State's case," particularly an insinuation that a witness' "testimony had not been truthful," will allow a prosecutor greater latitude in refuting those issues raised by defendant's argument. State v. Gladden , 315 N.C. 398, 423, 340 S.E.2d 673, 689 (1986).
Only an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting ex mero motu an argument that defense counsel apparently did not believe was prejudicial when originally spoken. It is not enough that the prosecutors' remarks were undesirable or even universally condemned.
Huey , 370 N.C. at 180, 804 S.E.2d at 470 (purgandum[2] ) (emphasis added).
Here, Defendant has challenged six statements from the State's closing argument. Apparently none of these statements, however, were so offensive or obnoxious that Defendant objected to them at trial. We address each of these statements in turn.
To establish the context of these challenged statements, we must initially evaluate Defendant's closing argument. Defendant's closing argument preceded the State's argument, and went well beyond simply focusing on the credibility of the victim and other witnesses. In over thirty instances in closing arguments, defense counsel said that the State's witnesses had lied or "didn't tell the truth." Defense counsel was abusive, injected his personal beliefs concerning the evidence presented, and expressed his personal belief that Defendant was innocent. Some of the relevant statements from defense counsel are set forth below:
So when we're talking about a credibility of a witness, that guy lied to us on the stand. And I specifically asked him did you - "Did he show you a photo of [Defendant]?" And he said, "Yes." He said, Yes, he did, and I identified both of those people ... That is a lie.
....
But mostly what we know about [Ms. Williams] is that she lies. She tells lots of little lies. ... [Ms. Williams] lied to [her friend] about going home to go to sleep because she didn't want to deal with him and what he would think about her being upset and going to the bar. ...
[Ms. Williams] lied about who approached who at the Hibernian.
....
We have the fact that she's lying to [another individual] particularly about [her friend] going to the Pickled Onion with them that night. ...
[S]he also lied to [another individual] by omission about doing other stuff with guys that night because there were at least two guys she was kissing on that night. ...
She lied about not[ ] being able to find [two people]. This is a weird little lie. ... That's a lie. ...
We know that [Ms. Williams] lied about - she lied on our video. ...
She also lied about how long it was before she went out to the woods. ...
[Ms. Williams] was lying about not intentionally lying to [an individual] about where she was and who she was with.
....
[Ms. Williams] was lying to law enforcement ....
[Ms. Williams] lied about seeing a fence. She lied about screaming in the woods. This is another weird little lie.
....
[Ms. Williams] lied about never being offered the rape kit by Officer Pettet.
....
Again, little lies. The problem is that little lies don't just stay little. They get big, and they become big lies, and as they become big lies, they can sometimes snowball out of control. That's what we have here.
....
The problem we have here is [Ms. Williams] doesn't tell the truth and she doesn't have good memory. She's all over the place. Her lies are couched in terms of not remembering when she's caught in those lies, saying she's confused[.]
[Ms. Williams] lied about the fact that she was - she hadn't kissed anybody. ...
We know that [another witness] lied to us too. ...
That's just one reason why maybe [Ms. Williams'] lying, why she's going through with this after three years. I don't know. ...
Again, little lies.
....
[Ms. Williams] perpetuates the lie. ... The lies start taking on a life of their own. [Ms. Williams] couldn't back down because, even though she's a liar, she desperately wants everyone around her to think that she's not.
It is against this backdrop that the State gave its closing argument.
A. Statement One
Defendant challenges the following statement made during the State's closing argument:
Because you know what? Because we as a society judge a rape victim. "No" should mean no, but society wants to know what you're wearing, how much you had to drink, how much you played a part because then maybe it's not really no when you say it. So bless [Ms. Williams'] heart for trying to say "no" so that someone else isn't put in that same position.
A prosecutor may argue that the jury could deter defendants from committing a similar crime in the future. State v. Thomas , 350 N.C. 315, 362, 514 S.E.2d 486, 515 (1999). A prosecutor may also argue that the jury functions as the voice of the community. State v. Nicholson , 355 N.C. 1, 43, 558 S.E.2d 109, 138 (2002).
Defense counsel had argued to the jury about the amount of alcohol the victim had consumed, what she had been wearing, and that she had regretted being "promiscuous" and not "angelic," as though these were justifications for rape and sexual assault. The prosecutor's statement merely encouraged the jury to prevent Defendant from sexually assaulting someone else the way he had sexually assaulted Ms. Williams. In addition, the prosecutor's argument also informed the jury that their verdict would speak for the community that rape victims should not be judged based upon their clothing or alcohol consumption. Both the prosecutor and defense counsel asked Ms. Williams during trial how much she had to drink the night of the incident. During trial, Ms. Williams' dress was discussed and introduced into evidence. Both the prosecutor and defense counsel asked Ms. Williams about her actions that night, such as kissing a different man earlier that night, continuously drinking throughout the night, and smoking marijuana. The prosecutor merely made a comparison by posing questions asked during trial to highlight what "someone else" might be grappling with before reporting an incident of rape or sexual offense. The prosecutor's statements along these lines were not error.
B. Statement Two
Defendant argues that the trial court should have intervened ex mero motu because the prosecutor improperly argued that defense counsel was blaming the victim when the prosecutor made the following statements:
All of that cross examination was victim blaming. You did this, you did this, you did this, you did this. Well, even in the light most favorable to [Defendant], the defendant, he made some bad decisions too. That's why women don't come forward.
....
Did you talk to additional people? Did you leave the bar with the defendant? Did you kiss the defendant? Did you think it was okay to touch her? And she says, "I was thinking that was what would get him to stop." Why were you going to willingly go to a house with a man that you don't know?
Why do you ask those questions? Because you are blaming the victim. Because you're setting up a "she asked for it." And ladies and gentlemen, that's not the law.
....
That's why women don't come forward if they feel like they've put themselves in a position.
The prosecutor neither inserted her personal opinion nor directly insulted Defendant or defense counsel. The questions posed were constructed from fair inferences drawn directly and exclusively from evidence admitted at trial. The questions posed were the same questions Ms. Williams was asked to answer at trial. Also, the record reflects that Defendant tried to call into question Ms. Williams' actions the night of the rape and assault, including drinking, smoking marijuana, and flirting with other bar patrons. At trial, the following exchanges were made between defense counsel and Ms. Williams during cross-examination:
[Defense Counsel:] That night, there were a lot of choices that you made that you indicated that you regretted?
[Ms. Williams:] Yes.
[Defense Counsel:] You regretted as you - but there were a lot of conscious decisions that you made from the very get-go from that day. So you consciously decided to leave work and go to the Hibernian; correct?
[Ms. Williams:] Correct.
[Defense Counsel:] You said you didn't feel good, you wanted to really go home and go to sleep, but you went to the Hibernian anyway?
[Ms. Williams:] Correct.
[Defense Counsel:] And you consciously decided to stay at the Hibernian for about three hours?
[Ms. Williams:] Correct.
[Defense Counsel:] And then you consciously decided to leave with [your friend] and go to her house for a couple of hours for pizza and beer and whatever and - at that point?
[Ms. Williams:] For pizza. I had a sip of beer but not for beer.
[Defense Counsel:] And then you consciously decided to take a puff of the marijuana that was offered you at [your friend]'s house?
[Ms. Williams:] Correct.
[Defense Counsel:] And then, from there, that you consciously decided to go to the Pickled Onion with [your friend]?
[Ms. Williams:] Correct.
[Defense Counsel:] And that, while at the Pickled Onion, you consciously decided to keep drinking?
[Ms. Williams:] I had one drink at the Pickled Onion so I wouldn't say keep drinking.
[Defense Counsel:] Okay.
[Ms. Williams:] I did have a drink.
....
[Defense Counsel:] Just you were? You were making a conscious decision that you wanted to have a few drinks?
[Ms. Williams:] Correct.
[Defense Counsel:] While you were at the bar, you made a conscious decision to start talking to other guys that were there?
[Ms. Williams:] Correct.
[Defense Counsel:] You made a conscious decision to leave the bar with one individual and go get in his car and make out?
[Ms. Williams:] Correct.
[Defense Counsel:] You made a conscious decision to, you know, get physical with him and do some touchy feely stuff with that guy in his car?
[Ms. Williams:] Correct.
The prosecutor's argument was not improper. Additionally, and especially without him objecting at trial, Defendant cannot now say he was prejudiced by the prosecutor simply re-posing the same questions that had been asked of the victim by defense counsel.
C. Statement Three
Defendant next challenges the following statement made by the prosecutor during closing arguments:
But the defendant had no recall. He couldn't give any details. He couldn't tell you anything initially until he started getting information and then said, "What if I had sex with that woman and don't remember?" "I don't know"; "I don't remember"; "I don't recollect I forced myself on her," which I would submit to you is not owning up to anything he did in that woods. "If I did that, then I'm sorry."
During argument, a lawyer may "on the basis of his analysis of the evidence, argue any position or conclusion with respect to a matter in issue." N.C. Gen. Stat. § 15A-1230(a). Here, the prosecutor's statement was not improper because it merely re-stated the evidence that had been introduced at trial, and the argument was a fair commentary on the evidence. Detective Eric Emser ("Detective Emser"), who had interviewed Defendant after Ms. Williams had reported the incident, testified that Defendant said "[he] did not remember having sex with anybody," he initially "didn't remember" having sex in the woods, and "he did not have any indication." Detective Emser also testified that when he asked Defendant "wouldn't or didn't" you force yourself on Ms. Williams, Defendant said "I don't think I did. I don't know, but if I did, I'm truly sorry." The prosecutor was merely repeating what had been disclosed at trial in order to address the matter at issue. This was not improper.
D. Statement Four
Defendant asserts that the prosecutor misstated the law when she made the following statement:
Is this behavior that our community is going to stand for? If you say yes, that means a man can get drunk, say he doesn't remember, and have sex with a woman of his choice. That's what that means.
"This Court has consistently held that a prosecutor may argue that a jury is the voice and conscience of the community ... [and] [a] prosecutor may also ask the jury to send a message to the community regarding justice." State v. Barden , 356 N.C. 316, 367, 572 S.E.2d 108, 140 (2002) (purgandum ). Our Supreme Court has affirmed that
[i]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community. Permitting the jury to act as the voice and conscience of the community is required because the very reason for the jury system is to temper the harshness of the law with the commonsense judgment of the community. In a criminal case such as this, therefore, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence.
State v. Scott , 314 N.C. 309, 311-12, 333 S.E.2d 296, 297-98 (1985) (purgandum ).
In the present case the prosecutor was making a conclusion based on the evidence presented at trial. At trial, Detective Emser had testified that Defendant told him that "there was a lot of alcohol involved" in this incident, at first Defendant only remembered "making out with a girl in the woods" but did not have sex with anyone that night, and, after pressing Defendant for more details, Defendant "eventually did concede that he had sex with [a girl]" in the woods. Thus, the prosecutor's statement was merely a concise recitation of the evidence. Furthermore, the prosecutor was urging the jury to be the voice and conscience of the community by not only thinking about the "behavior that our community is going to stand for," but also considering the importance of their role as jurors for the community. This was not remotely a misstatement of the law. The prosecutor was well within the law in explaining one of the core functions of the jury in our system of justice. Urging the jury to be the voice and conscience of the community is not improper.
E. Statements Five and Six
Defendant argues that these statements made by the prosecutor in closing arguments were improper:
Over the last several days, the defense has picked apart every single thing she did that night, every single slight nuance, to include whether she looked sweaty or whether it was urine. And that's exactly why the one out of every four women who is sexually assaulted doesn't take the chance to contact the police department.
So you should be offended that for 23 minutes today [defense counsel] called [Ms. Williams] a liar when her own client wasn't telling the truth. And that's exactly why young girls, old girls, women of all ages, probably even men, are too scared, are too embarrassed to go to the police.
While "[i]t is improper for the district attorney, and defense counsel as well, to assert in his argument that a witness is lying[,] [h]e can argue to the jury that they should not believe a witness, but he should not call him a liar." State v. Sexton , 336 N.C. 321, 363, 444 S.E.2d 879, 903 (1994) (citation and quotation marks omitted). "[P]rosecutors are allowed to argue that the State's witnesses are credible." State v. Wilkerson , 363 N.C. 382, 425, 683 S.E.2d 174, 200 (2009) (citations and quotation marks omitted). Moreover, "[i]n determining whether argument was grossly improper, this Court considers the context in which the remarks were made, ... as well as their brevity relative to the closing argument as a whole." State v. Taylor , 362 N.C. 514, 536, 669 S.E.2d 239, 259 (2008) (citation and quotation marks omitted). Also, when "[t]he offending comment was not only brief, but its overall significance to the entire closing argument was minimal; and the comment was made in the context of a proper ... argument[,]" intervention ex mero motu is unnecessary. State v. Fletcher , 354 N.C. 455, 484-85, 555 S.E.2d 534, 552 (2001). Again, we must consider "the context in which the remarks were made and to the overall factual circumstances to which they referred." Moseley , 338 N.C. at 50, 449 S.E.2d at 442 (citation and quotation marks omitted).
The prosecutor did not personally vouch for Ms. Williams' veracity, but instead provided jurors reason to believe Ms. Williams based on the evidence. The prosecutor properly argued that her witnesses were credible. The passing comment that Defendant "wasn't telling the truth" would ordinarily be improper. Here, however, in light of all of the evidence produced at trial, the highly improper argument of defense counsel, and the entirety of the prosecutor's closing argument, this single phrase is not sufficient reason for us to disturb Defendant's judgment. Gladden , 315 N.C. at 423, 340 S.E.2d at 689. Even if we assume this statement concerning Defendant's lack of credibility was improper, it was not prejudicial or "so grossly improper as to impede the defendant's right to a fair trial." Huey , 370 N.C. at 179, 804 S.E.2d at 469.
The prosecutor's statement that "one out of every four women who is sexually assaulted doesn't take the chance to contact the police department" was improper. There was no evidence produced at trial to support this statement. However, Defendant has failed to demonstrate that this statement was prejudicial or "so grossly improper as to impede his right to a fair trial." Id. This comment was made once, early in the prosecutor's closing, was brief, and its overall impact to the entire closing argument was minimal. This is not enough for us to disturb Defendant's judgment.
Accordingly, the trial court did not err when it declined to intervene ex mero motu in the State's closing argument.
II. Restitution
Defendant also argues that neither testimony nor documentary evidence was presented to the trial court to support the claim the Ms. Williams should be paid $2,090.00 in restitution for costs associated with attending counseling to deal with issues related to the sexual offense incident. We agree in part.
Even if a defendant fails to object to a restitution award in order to preserve the issue for appellate review, the "issue is deemed preserved for appellate review under N.C. Gen. Stat. § 15A-1446(d)(18)." State v. Shelton , 167 N.C. App. 225, 233, 605 S.E.2d 228, 233 (2004) (citation omitted). "The amount of restitution recommended by the trial court must be supported by evidence adduced at trial or at sentencing. The unsworn statement of the prosecutor is insufficient to support the amount of restitution ordered." Id. (purgandum ). In addition, "a restitution worksheet, unsupported by testimony or documentation, is insufficient to support an order of restitution." State v. Moore , 365 N.C. 283, 285, 715 S.E.2d 847, 849 (2011) (citation and quotation marks omitted).
However, "the quantum of evidence needed to support a restitution award is not high." Id.
When there is some evidence as to the appropriate amount of restitution, the recommendation will not be overruled on appeal. In applying this standard our appellate courts have consistently engaged in fact-specific inquiries rather than applying a bright-line rule. Prior case law reveals two general approaches: (1) when there is no evidence, documentary or testimonial, to support the award, the award will be vacated, and (2) when there is specific testimony or documentation to support the award, the award will not be disturbed.
Id . (purgandum ).
In the instant case, there was testimony and documentation concerning restitution, but it was not specific enough to support the trial court's award. During sentencing, the prosecutor provided the trial court with a document indicating that Ms. Williams had spent approximately $2,090.00 on professional mental health care. After introducing the document, the trial court allowed Ms. Williams to testify to the mental health problems she had been addressing with a counselor since the incident. The record does not contain the document accounting for Ms. Williams' counseling expenditures.
Although Ms. Williams' testimony does support an award of restitution, it was not specific enough to support the amount awarded by the trial court. See State v. Buchanan , --- N.C. App. ----, ----, 818 S.E.2d 703, 710 (2018) (vacating and remanding for re-sentencing on the issue of restitution because testimony and documentation submitted did not support the trial court's restitution award); State v. Sydnor , 246 N.C. App. 353, 359, 782 S.E.2d 910, 915 (2016) (vacating the restitution award and remanding for re-sentencing because there was "some evidence," fourbut it was too vague to support the award); State v. Talbot , 234 N.C. App. 297, 302, 758 S.E.2d 441, 444 (2014) (vacating and remanding for re-sentencing on the issue of restitution only because there was no evidentiary support for the amount in the record). Accordingly, we vacate the awarding of restitution and remand for a determination of the appropriate amount of restitution that is supported by the evidence.
Conclusion
Because the prosecutor's statements during closing argument were either not in error, or were not so grossly improper that Defendant was prejudiced, the trial court was not required to intervene ex mero motu . Because neither testimony nor documentation was sufficiently specific enough to support an order for restitution, we vacate this part of the judgment, and remand for sentencing on the sole issue of restitution.
NO ERROR IN PART; VACATED AND REMANDED IN PART.
Report per Rule 30(e).
Judges HUNTER and DAVIS concur.

A pseudonym is used to protect the identity of the victim.

Our shortening of the Latin phrase "Lex purgandum est. " This phrase, which roughly translates "that which is superfluous must be removed from the law," was used by Dr. Martin Luther during the Heidelberg Disputation on April 26, 1518 in which Dr. Luther elaborated on his theology of sovereign grace. Here, we use purgandum to simply mean that there has been the removal of superfluous items, such as quotation marks, ellipses, brackets, citations, and the like, for ease of reading.