IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-598

No. COA21-698

Filed 6 September 2022

Durham County, No. 16 CRS 56881

STATE OF NORTH CAROLINA

v.

RAY MARSHALL LAWSON, SR.

Appeal by Defendant from Order entered 27 January 2021 by Judge Josephine K. Davis in Durham County Superior Court. Heard in the Court of Appeals 7 June 2022.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Brenda Menard, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Wyatt B. Orsbon, for defendant-appellant.*

HAMPSON, Judge.

## Factual and Procedural Background

Raymond Marshall Lawson Sr. (Defendant) appeals from Judgment entered upon his conviction by a jury for felony animal cruelty. The Record, including evidence introduced at trial, tends to reflect the following:

Two brothers, William and Coleman Cameron, both of whom are now deceased, owned adjacent parcels of land in Durham County. Prior to their death, Defendant

paid Coleman $6,000 for "lifetime rights" to keep his horses on Coleman's property. Coleman also allegedly gave Defendant two of his horses in the same transaction. In total, Defendant kept seven horses on Coleman's property. In 2016 William died, and his nephew, Greg Lee (Mr. Lee), moved onto the land William formerly owned and "kept an eye on" Coleman's property.

¶ 3        After moving onto the property in 2016, Mr. Lee disputed Defendant's ownership of the two horses Coleman allegedly gave to Defendant, claiming they still belonged to the deceased Coleman. On 25 February 2016, Defendant discovered that Mr. Lee shot and killed one of the horses Coleman had given him after it allegedly "went lame." Mr. Lee attempted to cremate the body in lieu of burying it as the ground was too cold and hard at the time.

¶ 4        That day Defendant called the Durham County Sheriff's Office in an attempt to press charges against Mr. Lee for killing his horse. However, Sheriff's Deputies told Defendant the horse's ownership was a probate question, and they were powerless to help until a court resolved the issue. The Deputies directed Defendant to bury the dead horse and departed the scene. The next day, on 26 February 2016, Deputies returned for a "compliance follow-up." The Deputies confirmed that Defendant had buried the horse and saw him feeding the remaining horses.

¶ 5        On 4 June 2016, Mr. Lee called animal control to report several deceased horses on the property. Officers with the Durham County Animal Services division

(Animal Services) responded to the call. Once on the scene, Animal Services discovered the skeletal remains of three horses. Additionally, one emaciated "chestnut mare" horse was found in Defendant's paddock, still alive. The horse's ribs, spine, hips, and tail bone were visible through its skin. The paddock had no food or water, and the ground lacked any forageable vegetation. The horse also had a severe bacterial skin infection known as "rain rot," wherein the horse develops painful lesions on its skin.

Deputies obtained a warrant to seize the emaciated horse. The horse was taken to the Durham Animal Protection Society (APS). Durham APS subsequently transferred the horse to a rescue in Orange County for more intensive medical care.

Two days later, on 6 June 2016, a Deputy went to Defendant's house to speak with him. During the conversation, Defendant announced that he could no longer care for his horses and wished to surrender them.

Defendant filled out the paperwork and surrendered a total of five horses.

On 19 August 2019, Defendant was charged with felony animal cruelty, misdemeanor animal cruelty, and misdemeanor animal abandonment. Defendant's indictment for the felony animal cruelty charge originally read:

> And the jurors for the State upon their oath present that on or
> about the date of offense shown and in the county named above,
> the defendant named above unlawfully, willfully, and feloniously
> did maliciously torture by deprivation of necessary sustenance of

an animal, a chestnut mare horse named "Diamond," owned by
the Defendant and/or Raykell Jeanee Smith.

¶ 10   Subsequently, the State dismissed the two misdemeanor charges leaving only

the felony animal cruelty charge under N.C. Gen. Stat. § 14-360(b) (2021). The State

also moved to strike surplus language in the indictment seeking to remove the words

"named Diamond" from each count.

¶ 11   On 20 January 2021, the trial court conducted a hearing on the motion. At

this hearing, defense counsel argued that the change would force Defendant to defend

against broader charges. Prior to the change, Defendant argued he had planned his

defense around the theory that the horse the State seized was not Diamond and did

not belong to Defendant. Defense counsel argued Defendant would be prejudiced by

the amendment because he would now be unable to argue the horse at issue was not

Diamond and thus not his. The State countered by arguing that only one horse was

seized, and the modification would not change the alleged identity of the horse and

would not prejudice Defendant's planned argument. The State further argued that

the name was surplusage, and Defendant was still free to argue that the horse was

named Diamond and did not belong to Defendant. Ultimately the trial court granted

the motion over the defense counsel's objections.

¶ 12   Trial began on 20 January 2021. During the State's case in chief, four

witnesses testified that it was Defendant who owned the horse in question and the

paddock in which it was found. Additionally, Defendant's expert witness testified that the emaciated horse "could very well be Diamond." Defendant himself was unable to explain where his horse was now if, in fact, the State had incorrectly identified the horse seized by Animal Services as belonging to him.

¶ 13    During the State's closing arguments, the prosecutor argued that the intent element of animal cruelty was proven beyond a reasonable doubt by reading to the jury facts from a similar case, *State v. Coble*, 163 N.C. App. 335, 593 S.E.2d 109 (2004), in which this Court upheld an animal cruelty judgment. The prosecutor told the jury that the facts should "sound familiar" because they were "the same things we have here for intent." The State's closing argument drew no objections from defense counsel.

¶ 14    After trial, on 27 January 2021, the jury found Defendant guilty of felony animal cruelty. The trial court sentenced Defendant to 11 to 23 months in prison but elected to suspend the sentence for 36 months of supervised probation. Defendant gave Notice of Appeal in open court on the same day.

## Issues

¶ 15    The issues on appeal are whether: (I) the removal of the name of the horse from the indictment rendered it facially invalid; and (II) the prosecutor's recitation of case law during her closing argument constituted gross impropriety necessitating a new trial.

## Analysis

### I. Removal of Horse's Name from Indictment

¶ 16       Defendant contends that the horse's name was an essential element of the charged crime and that deleting it deprived him of the opportunity to prepare an adequate defense and now exposes him to double jeopardy.  Thus, Defendant argues that the State's amendment to remove the name of the horse from the indictment rendered it facially invalid and, therefore, deprived the trial court of jurisdiction.

¶ 17       "When a criminal defendant challenges the sufficiency of an indictment lodged against him, that challenge presents this Court with a question of law which we review *de novo.*" *State v. Oldroyd*, 380 N.C. 613, 2022-NCSC-27, ¶ 8.  Indictments are not required to conform to any "technical rules of pleading." *State v. Sturdivant,* 304 N.C. 293, 311, 283 S.E.2d 719, 731 (1981).  However, indictments must conform to certain threshold requirements and the strictures of N.C. Gen. Stat. § 15A-924 (2021).  Generally, indictments must (1) be sufficiently clear as to "allow the defendant to identify the event or transaction against which  [they have] been called to answer so that [they] may prepare a defense," (2) be sufficiently specific to "protect the defendant against being twice put in jeopardy for the same crime," *Oldroyd*, 2022-NCSC-27, ¶ 8, and (3) "allege all of the essential elements of the offense charged." *State v. Freeman*, 314 N.C. 432, 435, 333 S.E.2d 743, 745 (1985).

The requirements are satisfied with "[a] plain and concise factual statement in each count which, without allegations of an evidentiary nature, asserts facts supporting every element of a criminal offense and the defendant's commission thereof with sufficient precision clearly to apprise the defendant or defendants of the conduct which is the subject of the accusation." N.C. Gen. Stat. § 15A-924(a)(5) (2021). *See also Oldroyd*, 2022-NCSC-27, ¶¶ 7–8 ("[A]n indictment is sufficient if it asserts facts plainly, concisely, and in a non-evidentiary manner which supports each of the elements of the charged crime with the exactitude necessary to allow the defendant to prepare a defense and to protect the defendant from double jeopardy.").

Additionally,

> [e]very criminal proceeding by warrant, indictment, information, or impeachment is sufficient in form for all intents and purposes if it express the charge against the defendant in a plain, intelligible, and explicit manner; and the same shall not be quashed, nor the judgment thereon stayed, by reason of any informality or refinement, if in the bill or proceeding, sufficient matter appears to enable the court to proceed to judgment.

N.C. Gen. Stat. § 15-153 (2021).

Pursuant to N.C. Gen. Stat. § 15A-923(e) (2021), indictments may not be amended, meaning there must be no change "which would substantially alter the charge set forth in the indictment." *State v. Price,* 310 N.C. 596, 598, 313 S.E.2d 556, 558 (1984). However, "if an indictment contains an averment unnecessary to charge the offense, such averment may be disregarded as inconsequential surplusage." *State*

*v. Grady*, 136 N.C. App. 394, 396–97, 524 S.E.2d 75, 77 (2000). Accordingly, surplus language which "in no way change[s] the nature or the degree of the offense charged" may be stricken from an indictment. *State v. Peele*, 16 N.C. App. 227, 233, 192 S.E.2d 67, 71, *cert. denied*, 282 N.C. 429, 192 S.E.2d 838 (1972).

¶ 21    In the case at bar, Defendant was indicted for felony animal cruelty under N.C. Gen. Stat. § 14-360(b) (2021). The elements of felony animal cruelty under N.C. Gen. Stat. § 14-360(b) (2021) are (1) intentional and malicious (2) torture, mutilation, maiming, cruelly beating, disfiguring, poisoning, or killing of (3) any animal.[1] Thus, the indictment must allege all of these elements in a non-evidentiary fashion and in a manner sufficiently clear and specific so as to "allow the defendant to identify the event or transaction against which he had been called to answer so that he may prepare a defense" and "protect the defendant against being twice put in jeopardy for the same crime." *Oldroyd*, 2022-NCSC-27, ¶ 8.

¶ 22    Here, the trial court's Order granting the motion to strike surplus language removed only the words "named 'Diamond'" from the indictment, leaving the animal described as only a "chestnut mare horse." However, on 4 June 2016, there was only

---

[1] "As used in this section, the words 'torture', 'torment', and 'cruelly' include or refer to any act, omission, or neglect causing or permitting unjustifiable pain, suffering, or death. As used in this section, the word 'intentionally' refers to an act committed knowingly and without justifiable excuse, while the word 'maliciously' means an act committed intentionally and with malice or bad motive. As used in this section, the term 'animal' includes every living vertebrate in the classes Amphibia, Reptilia, Aves, and Mammalia except human beings." N.C. Gen. Stat. § 14-360(c) (2021).

one living horse, a chestnut mare, that Animal Services seized from the property. Thus, the indictment, with or without the horse's name, was sufficiently clear as to "allow the defendant to identify the event or transaction against which he had been called to answer so that he may prepare a defense." *See Oldroyd*, 2022-NCSC-27, ¶ 8. Indeed, the identity of the chestnut mare horse at issue was known to all parties at all times, both before and after the motion to strike surplus language. Additionally, only one horse was ultimately discussed at trial, and, despite the change in the indictment, the State continued to allege that the horse's name was "Diamond."

¶ 23        Following the modification and through trial, Defendant and all other parties continued to understand precisely what horse and what event the indictment referred to, and the same remains clear to any potential future court. Thus, the indictment remained sufficiently clear to "allow the defendant to identify the event or transaction against which he had been called to answer so that he may prepare a defense," and sufficiently specific to "protect the defendant against being twice put in jeopardy for the same crime." *Id.*

¶ 24        Moreover, under N.C. Gen. Stat. § 14-360(b) (2021), the name of the horse is not an essential element of the crime of felony animal cruelty. Indeed, it has long been held that it is acceptable to identify subject animals by general description in indictments. *See State v. Credle*, 91 N.C. 640, 643–46 (1884) (the words "cattle beast" in an indictment were sufficient in a case where the defendant was charged with

killing the ox of another). In this case, ultimately, the name of the horse was immaterial to the offense charged because there was no confusion as to the horse— the chestnut mare—at issue. As such, here, striking the name of the horse "in no way change[s] the nature or the degree of the offense charged[.]"[2] *Peele*, 16 N.C. App. at 233, 192 S.E.2d at 71.

¶ 25    Therefore, inclusion of the horse's name was not necessary in this case to charge the offense by way of a facially valid indictment and did not change the nature or degree of offense charged. Thus, it was permissible to strike the name of the horse from the indictment as surplusage. Consequently, the trial court did not err in allowing the State's motion to amend the indictment.

## II. The State's Closing Argument

¶ 26    Defendant contends that the prosecutor's reading of case law in closing argument constituted gross impropriety making it an error for the trial court to fail to intervene *ex mero motu*, necessitating a new trial.

¶ 27    In this case, because the statement at issue did not draw an objection from defense counsel, our review is conducted under a heightened standard.

> The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing

---

[2] There may well be instances where the name of the animal at issue may be necessary—or at least helpful—to avoid confusion, to distinguish between animals, avoid double jeopardy concerns and, in turn, amending an indictment to reference a potentially different animal could be problematic. We need not and do not decide that issue today as, in this case, the Record reflects no confusion as to the horse the State alleged to be at issue.

> counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu. . . .* In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord . . . .

*State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002). In conducting this review, we must analyze "(1) whether the argument was improper; and, if so, (2) whether the argument was so grossly improper as to impede the defendant's right to a fair trial." *State v. Huey*, 370 N.C. 174, 179, 804 S.E.2d 464, 469 (2017). Both elements are essential for this Court to find that "the error merits appropriate relief." *Id.*

When reviewing for gross impropriety, "[o]ur standard of review dictates that '[o]nly an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken.' " *Id.* (quoting *State v. Anthony*, 354 N.C. 372, 427, 555 S.E.2d 557, 592 (2001)). "[I]t 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.' " *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L.Ed.2d 144, 157 (quoting *Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir. 1983)). A prosecutor's statements are not reviewed in a vacuum; rather,

we take them "in context and in light of the overall factual circumstances to which they refer." *State v. Alston*, 341 N.C. 198, 239, 461 S.E.2d 687, 709 (1995).

¶ 29        Further, even when an argument is deemed so improper, and the trial court should have intervened *ex mero motu*, this Court is not permitted to presume prejudice; rather, Defendant has the burden of demonstrating prejudice. *See Huey*, 370 N.C. at 186, 804 S.E.2d at 474. In order for a new trial to be ordered, the prosecutor's statements must have been so improper that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Wainwright*, 477 U.S. at 169, 91 L. Ed. 2d at 145. There must be "a showing that the argument is so grossly improper that a defendant's right to a fair trial was prejudiced by the trial court's failure to intervene." *Huey*, 370 N.C. at 180, 804 S.E.2d at 469–70. Additionally, when the Supreme Court of North Carolina "has found the existence of overwhelming evidence against a defendant, [it has] not found statements that are improper to amount to prejudice and reversible error." *Id.* at 184.

¶ 30        "In jury trials, the whole case as well of law as of fact may be argued to the jury." N.C. Gen. Stat. § 7A-97 (2021). This statute "grants counsel the right to argue the law to the jury, which includes the authority to read and comment on reported cases and statutes." *State v. Gardner*, 316 N.C. 605, 611, 342 S.E.2d 872, 876 (1986). However, "counsel may not read the facts contained in a published opinion together

with the result to imply that the jury in his case should return a favorable verdict for his client." *Id.*

¶ 31 Here, the prosecutor read the jury the facts of *State v. Coble*, 163 N.C. App. 335, 593 S.E.2d 109 (2004), and told them that the facts should "sound familiar" because "that is the same things we have here for intent." Presuming, without deciding, the prosecutor's reading from *Coble* and argument thereon in this case was improper, Defendant cannot show the argument was so grossly improper, in light of the full context and the evidence presented against Defendant, that Defendant's "right to a fair trial was prejudiced by the trial court's failure to intervene." *Huey*, 370 N.C. at 174, 804 S.E.2d at 469–70.

¶ 32 The evidence presented included the testimony of four witnesses who all testified that the horse at issue belonged to Defendant and could only have belonged to Defendant. Additionally, the four witnesses all testified that the paddock in which the horse was found belonged to Defendant. Defendant's own expert witness also testified that the horse at issue "could very well be Diamond." Multiple witnesses, including one who was admitted as an expert on equine care, testified about the emaciated and infected condition in which the horse was found. Moreover, for his own part, Defendant testified that he visited the paddock every day. He could not explain where his horse was now if the horse in the State's possession was not his.

¶ 33        Therefore, in light of the evidence presented at trial, we cannot conclude Defendant was deprived of a fair trial or his right to due process.  Thus, Defendant has not established the prosecutor's closing argument was so grossly improper the trial court was required to intervene *ex mero motu.*  Consequently, the trial court did not err by failing to intervene in the closing argument *ex mero motu.*

## **Conclusion**

¶ 34        Accordingly, for the foregoing reasons, we conclude there was no error at trial and affirm the Judgment against Defendant.


NO ERROR.

Judges INMAN and GRIFFIN concur.